79 F.3d 1153
 1996-1 Trade Cases P 71,366
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
MAXIM INTEGRATED PRODUCTS, INC., a Delaware corporation,
Plaintiff-Appellant,
v.
ANALOG DEVICES, INC., a Massachusetts corporation, Defendant-Appellee.
 No. 94-16744.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 10, 1996.
Decided March 15, 1996.
 
 1
 Before: ALDISERT,* SCHROEDER, and TROTT Circuit Judges.
 
 
 2
 MEMORANDUM**
 
 
 3
 Maxim Integrated Products, Inc. (Maxim), a manufacturer of integrated circuits, filed suit against Analog Devices, Inc. (ADI) after ADI enticed several major independent distributors of integrated circuits to terminate their contracts with Maxim and sign exclusive dealing agreements with ADI. Maxim's claims against ADI included: (1) violations of §§ 1 and 2 of the Sherman Act; (2) unfair business practices under California Business and Professions Code § 17200; (3) intentional interference with contractual relations; and (4) intentional interference with prospective economic advantage. Following a motion by ADI, the district court granted summary judgment against all of Maxim's claims.
 
 
 4
 We affirm the grant of summary judgment on the antitrust claims, the claim for interference with prospective economic advantage, and the claim for intentional interference with contractual relations (except as this claim applies to the alleged interference with the Pioneer Standard contract). We reverse the grant of summary judgment on Maxim's § 17200 claim, as well as the claim that ADI intentionally interfered with Maxim's contractual relationship with Pioneer Standard.
 
 STANDARD OF REVIEW
 
 5
 The district court's award of summary judgment is reviewed de novo. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995).
 
 DISCUSSION
 I. Sherman Act § 1 claim
 
 6
 To prevail on a § 1 claim, the plaintiff must show that the contract unreasonably restrained competition at the consumer level. See Ferguson v. Greater Pocatello Chamber of Commerce, 848 F.2d 976, 982 (9th Cir.1988) (antitrust action failed, in part, because plaintiff failed to show harm to consumers). In this case, Maxim fails to bring forward evidence of restrained competition sufficient to survive ADI's motion for summary judgment.
 
 
 7
 Maxim asserts that ADI's distributors now account for 58% of the analog circuits sold in North America, and that this fact would allow a jury to infer that competition at the consumer level has declined. This argument, however, is not persuasive. Maxim is the only manufacturer that has been terminated by the distributors pursuant to the ADI contracts.[1] One can only draw the conclusion that other manufacturers do not consider the distributors necessary to reach consumers. Furthermore, the fact that Maxim's sales through distributors in the year following the terminations increased by up to 25%,[2] while its customer retention rate stayed at roughly the same level, demonstrates that Maxim is able to reach consumers despite the exclusive agreements.[3]
 
 
 8
 Maxim also argues that the anticompetitive nature of the exclusive dealing agreements is demonstrated by the fact that ADI increased list prices after the agreements were signed. See Oltz v. St. Peter's Community Hosp., 861 F.2d 1440, 1448 (9th Cir.1988) (actual price increase and exclusion of competition justify finding of harm to competition under § 1). However, Maxim failed to produce any evidence that a higher price was actually paid by consumers.
 
 
 9
 In addition to the lack of evidence of an anticompetitive effect of the exclusive agreements, the fact that ADI's contracts allow the distributors to, without penalty, terminate their relationship with ADI strongly favors a finding of no unreasonable restraint on competition.[4] Competition can thrive because ADI's exclusive dealers may be enticed away at any time by a competitor who offers a better deal. See Roland Machinery Co. v. Dresser Ind., 749 F.2d 380, 395 (7th Cir.1984) ("Exclusive-dealing contracts terminable in less than a year are presumptively lawful ...").
 
 
 10
 Because Maxim has not produced sufficient evidence to show that the exclusive dealing agreements unreasonably restrain competition, we affirm the district court's grant of summary judgment on the Sherman Act § 1 claims.
 
 II. Sherman Act § 2
 
 11
 In order to prove the tort of attempted monopolization under § 2 of the Sherman Act, the plaintiff must show (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. 15 U.S.C. § 2; Spectrum Sports, Inc. v. McQuillan, 113 S.Ct. 884, 890-91 (1993).
 
 
 12
 Maxim's claim fails the third prong of the § 2 analysis. Maxim cannot even show that ADI has unreasonably restrained competition (see discussion supra ) much less show a dangerous probability that ADI will achieve monopoly power.
 
 
 13
 III. Intentional interference with contractual relations.
 
 
 14
 Maxim's action for intentional interference with contractual relations can be broken into two separate claims: (1) that ADI induced the independent distributors to terminate their contracts with Maxim (the general interference claim); and (2) that ADI caused Pioneer Standard, an independent distributor, to secretly divert one million dollars in orders for chips from Maxim to ADI. We uphold the district court with respect to the general interference claim, but reverse with respect to the claim that ADI intentionally interfered with Maxim's contractual relationship with Pioneer Standard.
 
 A. The general interference claim
 
 15
 In California, a stranger to a contract may be held liable in tort for intentionally interfering with the performance of a contract. Pacific Gas & Elec. Co. v. Bear Stearns & Co., 791 P.2d 587, 589-90 (Cal.1990). In order to establish liability, the plaintiff must prove:
 
 
 16
 (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damages.
 
 
 17
 Id. Moreover, if the contract interfered with is terminable at will, the plaintiff must also prove that the defendant's interference was "wrongful by some measure beyond the fact of the interference itself." Della Penna v. Toyota Motor Sales, U.S.A., 902 P.2d 740, 751 (Cal.1995). Because Maxim's allegations that ADI violated the antitrust laws (the only claims of "wrongful" conduct that Maxim makes against ADI) do not survive summary judgment, Maxim's claim that ADI induced the terminations of Maxim's key distributors must also fail if we determine that the contracts were terminable at will.
 
 
 18
 Maxim argues that its contracts with the independent distributors were not "at-will" because each contract contained a provision which required a terminating dealer to return all of its Maxim stock and pay 15% handling fee on the returned products. We disagree with Maxim's analysis and hold that an "at-will" contract is an agreement which either party may terminate without breaching the agreement. Contra Memorial Gardens v. Olympian Sales & Manage, 690 P.2d 207 (Colo.1984). Here, the distributors did not breach their contracts with Maxim by terminating their distributor agreements. Termination was provided for by the agreements themselves. At any time, Maxim had no legal assurance that its relationship with the independent distributors would continue longer than the thirty-day notice period required by the contracts for termination. Presented with these facts, we hold that the contracts between Maxim and the independent distributors were terminable "at-will" and therefore summary judgment was proper.
 
 
 19
 B. Interference with Maxim's contractual relationship with Pioneer Standard
 
 
 20
 Maxim asserts that ADI induced Pioneer Standard to breach its contractual obligation to:
 
 
 21
 use its best efforts to promote the use and sale within the Territory of all the Product(s) contemplated under this agreement and to develop and supply as broad a market therefore as shall be possible."
 
 
 22
 (emphasis added). Maxim claims that months before Pioneer Standard gave its thirty-day notice of termination, ADI induced Pioneer Standard to switch already-booked but unfilled Maxim orders and to divulge confidential Maxim information.
 
 
 23
 ADI makes two arguments against Maxim's accusation. First, ADI asserts that, as a matter of law, Pioneer Standard did not violate any of its contractual obligations to Maxim by diverting business to ADI. Second, ADI contends that Pioneer Standard's actions were unilateral and therefore ADI cannot be held liable for any breach that might have occurred.
 
 
 24
 1. Did Pioneer Standard violate its contract with Maxim?
 
 
 25
 ADI's first argument is that, as a matter of law, Pioneer Standard could not violate the Maxim contract's best efforts clause. We disagree.
 
 
 26
 There is no firm rule as to what constitutes adequate best efforts. Some cases have suggested that a best efforts clause required the promisor to employ the same efforts he "has employed in other contracts where the adequacy of his efforts have not been questioned." Olympia Hotels Corp. v. Johnson Wax Dev. Corp., 908 F.2d 1363, 1373 (7th Cir.1993). Other cases merely require that the promisor not undertake activity that "is so manifestly harmful ... as to justify the court in saying there was a breach of the covenant." Van Valkenburgh, Nooger & Meville, Inc. v. Hayden Publishing Co., 330 N.Y.S.2d 329, 334, cert. denied, 409 U.S. 875 (1972).
 
 
 27
 Essentially, what we have here is a dispute over the interpretation of "best efforts." This question is properly one for the jury. United Telecomm v. American Television & Comm. Corp., 536 F.2d 1310, 1319 (10th Cir.1976) ("Both parties had introduced evidence bearing on the negotiations and the meaning intended for the term "best efforts." When the interpretation is in dispute as is was here, it is a question for the jury."). Therefore, we reject ADI's argument that, as a matter of law, there was no breach of the contract.
 
 
 28
 2. Did Maxim present sufficient evidence that Pioneer Standard's actions were not unilateral?
 
 
 29
 Maxim's evidence that ADI was involved in Pioneer Standard's decision to undertake the challenged actions is more than sufficient to survive summary judgment. For example, one internal Pioneer Standard memo states that there was an agreement between ADI and Pioneer Standard "to identify [to ADI] major Maxim opportunities, and [ADI] will be competitive to assure [Pioneer Standard] of transferring the business...." Another memo states "I met with the ADI rep ... and shared with him all of the [Maxim] business we have done over the past year."
 
 
 30
 Because Maxim presented enough evidence for a rational finder of fact to determine that ADI induced Pioneer Standard to violate its contract with Maxim, we reverse the district court's grant of summary judgment on Maxim's claim that ADI intentionally interfered with the Pioneer Standard contract.
 
 
 31
 IV. California Business and Professions Code § 17200
 
 
 32
 Section 17200 defines unfair competition as "any unlawful, unfair or fraudulent business act or practice." Cal.Bus. & Prof.Code. § 17200. "Unlawful" practices under this section are "any practices that are forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court made." Sanders v. Superior Court, 27 Cal.App.4th 832, 839 (1994).
 
 
 33
 Maxim cannot base its § 17200 claim on the alleged Sherman Act violations because these claims have failed to survive summary judgment. Similarly, because ADI has not imposed an unreasonable restraint on competition, Maxim cannot create a § 17200 claim here by alleging that ADI violated § 5 of the FTC Act. See Beltone Electronics Corp., 100 F.T.C. 68 (1982); ABA Antitrust Section, Antitrust Law Developments 175-76 (3d ed. 1992) (after Beltone, an examination of exclusive dealing arrangements under § 5 of the FTC Act is essentially the same as the Sherman Act's "unreasonable restraint" analysis).
 
 
 34
 However, because Maxim's claim that ADI interfered with the Pioneer Standard contract should have survived summary judgment, the related claim under § 17200 should also survive. Therefore, we reverse the grant of summary judgment on the § 17200 claim.
 
 CONCLUSION
 
 35
 We have considered all of the other arguments raised in this appeal and determined that they do not merit discussion. The grants for summary judgment on the Sherman Act claims are affirmed, as are all of the claims for interference with prospective economic advantage and the claims for interference with contractual relations (except with respect to Pioneer Standard). The grant of summary judgment for intentional interference with the Pioneer Standard contract is reversed as is the grant of summary judgment on the § 17200 claim.
 
 
 36
 Affirmed in part, reversed in part. Both parties will bear their own costs of this appeal.
 
 
 
 *
 The Honorable Ruggero J. Aldisert, Senior United States Circuit Judge for the Third Circuit Court of Appeals, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 The ADI contracts prohibit distributors from selling non-ADI products which substantially compete with ADI's products
 
 
 [2]
 Maxim asserts that this figure is misleading because it does not account for the fact that Hall-Mark may stop distributing Maxim's products if this court rules in favor of ADI. However, the fact remains that even with 58% of the independent distributors no longer selling its products, Maxim's sales grew, indicating that Maxim can still reach consumers
 
 
 [3]
 Moreover, Maxim's own expert raised considerable doubt whether Maxim has been foreclosed from consumers when he testified:
 A. [ADI]'s customers could switch their business and go elsewhere. They were all able to buy it.
 Q. So, no customer was in fact, as a practical matter, disabled from buying Maxim product as a result of this clause you're saying?
 A. Correct.
 
 
 [4]
 Maxim's contention that the ADI-distributor contracts may not be terminated without penalty is meritless. Each of the agreements state that if the contract is terminated because the distributor sells a competitor's products, ADI will repurchase all of the ADI product inventory at the price paid by the distributor. No other damages are permitted under the contract. Furthermore, the fact that terminating the agreement will cut off the supply of ADI product is of no import because "[a] manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 761 (1984)