**PINPOINT CONSUMER TARGETING SERVICES, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 02–714C.**

United States Court of Federal Claims.

Dec. 18, 2003.

Ira E. Hoffman, Grayson Kubli & Hoffman, McLean, VA, for plaintiff. Melissa A. Roover, of counsel.

Patricia M. McCarthy, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.

### OPINION AND ORDER

HODGES, Judge.

This is an action for breach of contract. Plaintiff claims that the United States Defense Commissary Agency did not use its best efforts to assist PinPoint in promoting its government-licensed coupon program. The parties filed cross-motions for summary judgment and defendant filed a counterclaim for unpaid royalties. The meaning of "best

---

efforts" as used in the License Agreement controls this case. We grant defendant's motion for summary judgment and enter judgment for defendant on its counterclaim.

## I. SUMMARY

### A.

The Department of Defense operates commissaries for military personnel and their families through the Defense Commissary Agency, sometimes known as DeCA. *See* 32 C.F.R § 383a. The Agency's mission is to "[p]rovide an efficient and effective worldwide system of commissaries for the resale of groceries and household supplies at the lowest practical price (consistent with quality) to members of the Military Services, their families, and other authorized patrons, while maintaining high standards of quality, facilities, products and service." 32 C.F.R. § 383a.3.[1]

Commissaries differ little from civilian grocery stores or supermarkets except for their lower prices. *See* 10 U.S.C. § 2486(a) (stating that commissaries sell merchandise similar to that sold in commercial grocery stores). Federal law requires that commissaries provide consistently low prices, currently cost plus five percent. 10 U.S.C. §§ 2486(c)-(d). The five percent markup covers the cost of building new facilities and maintaining current ones. DeCA manages 281 commissaries for military personnel and retirees, and their families. A family of four saves more than $2400 per year on an average of thirty percent lower prices at commissaries. *See* Vision Statement of the Defense Commissary Agency, Defendant's Appendix p. 648. Commissaries "enhance the quality of life for America's military and their families .... [and] help the United States recruit and keep the best and brightest men and women in the service of their country." *Id.*

DeCA advertised in a January 1999 industry magazine for "energetic, innovative and aggressive companies to develop, implement and maintain high quality professional in-store advertising programs [including] coupon dispensers or advertisements on checkout order dividers." Plaintiff PinPoint responded to DeCA's advertisement with a proposal to print manufacturers' coupons on the reverse side of register tapes for government commissaries. PinPoint had been in the marketing business since 1995, focusing on selling advertising on cash register tapes. Plaintiff agreed to pay a license fee to the Agency and to provide the register tapes at no cost. The coupon program was to require very little administrative support from the Government.[2]

The Government accepted PinPoint's offer and the parties entered a two-year License Agreement. The Agreement granted plaintiff a license to print register tape coupons for government commissaries world wide. Plaintiff could renew the license for two years. It could terminate the program upon sixty-days notice if it could not sell at least fifty percent of available coupon space. DeCA and PinPoint inaugurated the Register Tape Coupon Program on September 1, 2000.[3]

### B.

Plaintiff claims that defendant breached the License Agreement by refusing to use its best efforts as required by the contract. PinPoint asked defendant to take various actions to promote the Coupon Program but DeCA did not think that some were appropriate for the Government to undertake. The parties could not agree fully on measures that DeCA should take to support plaintiff's Program during the term of the License Agreement. Nevertheless, PinPoint asked the Contracting Officer in November 2001 to extend its license for another two

---

**1.** Section 383a.4 describes the organization of the Defense Commissary Agency. The responsibilities and functions of the Agency are listed at section 383a.5.

**2.** PinPoint stated that the Register Tape Coupon Program was "virtually turnkey from [DeCA's] administrative perspective."

**3.** The Coupon Program was delayed for two months because plaintiff had been unable to sell sufficient space on the register tapes.

years. The Contracting Officer urged Pin-Point to decide whether it was willing to conduct an extension of the Coupon Program on defendant's terms. That is, he wanted an understanding from PinPoint that DeCA had fulfilled its obligations under the License Agreement.

### C.

Plaintiff contends that defendant's marketing strategy undermined PinPoint's Coupon Program. DeCA used both High–Low and Everyday Low Price or EDLP strategies during the license period. The effect of an EDLP strategy can be that vendors may have less money available for advertising. The Coupon Program was a form of advertising, so plaintiff believes that DeCA's use of EDLP meant the possibility of less participation by vendors in plaintiff's Program.

### D.

The parties held a meeting to address PinPoint's concerns in early February 2002. Plaintiff wrote DeCA after the meeting to suggest efforts that defendant could make to improve the Program. The Agency agreed to several of these requests but felt that some efforts would violate ethics regulations applicable to DeCA and to government employees generally.[4]

Defendant's Executive Director for Operations and Product Support recommended that DeCA not renew the Coupon Program with PinPoint. The Contracting Officer agreed and notified PinPoint in March 2002 that it would not renew the Program.[5] Pin-Point filed a claim with the Contracting Offi-

cer on April 11, 2002 and the Contracting Officer has not responded. *See* 41 U.S.C. § 605(c)(5). This Court has jurisdiction pursuant to 41 U.S.C. § 609(a).

### E.

The parties filed cross-motions for summary judgment. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c). The parties do not dispute any factual issues necessary for the court to rule whether defendant made its best efforts to assist plaintiff.[6] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987) (citations omitted).

The parties agree that summary judgment is the proper vehicle for resolving this case. This does not relieve the court of the need to assess the Record to insure that genuine or material facts are not in dispute. Cross-motions for summary judgment call upon the court to evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1322 (Fed.Cir. 2001) (citations omitted); *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1338–39 (Fed.Cir.2001) (citations omitted). Summary judgment is proper when "there is an absence of evidence to support the non-moving party's case."

---

4. *See, e.g.,* 5 C.F.R. § 2635.702(c) ("An employee shall not use or permit the use of his Government position or title or any authority associated with his public office to endorse any product, service or enterprise …."); *see also* DOD 5500.7–R § 3–209 ("Endorsement of a non-federal entity, event, product, service, or enterprise, may be neither stated nor implied by DoD or DoD employees in their official capacities and titles … may not be used to suggest official endorsement or preferential treatment of any non-Federal entity ….").

5. DeCA terminated the contract pursuant to Paragraph 9 of the License Agreement: "This Agreement shall be for a term of two (2) years, commencing on the date the agreement is signed

by both parties, and may be renewable for an additional two-year period."

6. Counsel agree that the test of best efforts in this case is a legal issue and that no material factual issues are in dispute. Defendant's counsel stated, "I agree with [plaintiff's counsel] that there really isn't much dispute as to what the parties have done …. The issue is really a legal question as to … what precisely the terms of the agreement are." Plaintiff's counsel made a similar assertion: "Our position is that the government didn't use its best efforts, and [that is] a question of law. There is no real dispute over what efforts the DeCA people used." *See* Transcript of Hearing, May 6, 2003, page 9, lines 21–25, and page 12, lines 8–12.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## II. FACTS

### A.

DeCA and PinPoint began performance under the License Agreement on September 1, 2000. The parties delayed the Program for two months because PinPoint had been unable to sell sufficient advertising space on the register tapes. PinPoint could have terminated the License Agreement then, but chose not to.[7]

PinPoint was responsible for all costs of operating and maintaining the Register Tape Coupon Program. Defendant's responsibility under the License Agreement was to "use its best efforts to assist PinPoint in the development and implementation" of plaintiff's advertising sales program. DeCA's duties were to assist PinPoint in areas including but not limited to the following:

(a) Promote PinPoint's register tape program;

(b) Provide PinPoint with DeCA promotional schedules complete with vendor program participation information;

(c) Provide PinPoint a listing of current DeCA commissaries (Appendix A);

(d) Provide PinPoint with an updated list of all buyers and merchandise personnel by department (name and phone number), as available;

(e) Integrate PinPoint Register tape coupon program to DeCA Internet web sites, as appropriate;

(f) Coordinate DeCA promotions with vendor advertising and marketing programs;

(g) Notify PinPoint in writing of any claims or damages;

(h) Provide PinPoint a Letter of Authorization for distribution to Store Directors.

License Agreement, Paragraph 5.

The parties discussed the types of support that defendant could provide within ethical rules and regulations that apply to the De-partment of Defense and to government employees generally. Though they could not agree on some of these issues, plaintiff asked the Contracting Officer to extend PinPoint's license in November 2001. This was more than a year after the parties began performance of the Agreement. The Contracting Officer wanted to be sure that plaintiff understood DeCA's duties and its limitations under the Agreement. He wanted an agreement with plaintiff concerning the parties' obligations before extending the License. The Contracting Officer urged PinPoint in January 2002 to consider whether it really wanted a two-year extension.

The parties held meetings in January and February 2002 to address PinPoint's concerns. DeCA asked PinPoint to specify its position in writing. PinPoint sent a letter to defendant, dated February 14, 2002. The letter expressed satisfaction that the parties had exhibited "a new spirit of cooperation" and specified nine efforts that "DeCA can undertake to promote the Register Tape Coupon Program." These efforts included issuing a new Notice to Trade to remind vendors of DeCA's licensed media programs; issuing a press release to announce DeCA's extension of the Register Tape Coupon Program; and directing the commissaries' buyers to ask suppliers to describe their promotional efforts in support of their product. PinPoint also wanted DeCA to direct its buyers to recommend that suppliers participate in licensed media programs and to provide brochures that suppliers could use to show their interest in such programs.

Mr. Vitikacs was DeCA's Executive Director for Operations and Product Support. He assessed PinPoint's nine proposals in a February 25 Memorandum and considered only three to be appropriate. Mr. Vitikacs found the remainder to be impractical or inconsistent with ethical regulations to which DeCA buyers are subject. For example, plaintiff's February 14 letter asked defendant

---

7. The License Agreement states: "This agreement may be terminated if PinPoint is unable to obtain enough vendors to purchase at least fifty (50) percent of the coupons available under the program. In such case, PinPoint shall notify DeCA in writing at least sixty (60) days prior to termination." License Agreement, Paragraph 9.

to amend Notice to the Trade 99–42.[8] Pin-Point's purpose was to "include the Register Tape Coupon Program in published DeCA sales plans." Such an amendment would enable DeCA to audit coupon distribution.

This was the same Notice to the Trade that the parties had discussed the previous November. The Contracting Officer had rejected repeal or amendment of this NTT in a November 15 letter to PinPoint. He had stated that DeCA could not amend the Notice to the Trade because it "reflects a promotional process matrix that supports the main strategic objective of this Agency. Our first priority is to deliver the best possible price to all customers." [9]

Mr. Vitikacs echoed this policy in his February 25 Memorandum:

DeCA considers coupon efforts an enhancement to the promotional offer however we will not attempt to directly assess their price point impact. Regardless of Pinpoint's view that DeCA would be able to audit coupon distribution to the stores, the likelihood still exists that a customer will not receive every coupon that is on the back of the register tapes. NTT 99–42 will not be amended to accommodate Pin-Point's Program.

Memorandum for CICST from Robert G. Vitikacs, February 25, 2002.

Plaintiff also asked DeCA to direct its buyers to "offer each supplier to participate in one or more of DeCA's Licensed Media Programs." Plaintiff made a script available for this purpose. The script includes the following: "Did you know the PinPoint Register Program gives the coupons to the patron as he is leaving the Commissary; thereby, enticing him to return and redeem the coupons?" Mr. Vitikacs thought that such an "offering" to a vendor would put defendant's buyers in a "precarious position because it may be construed by the vendor that participating in our Licensed Media Agreements is a required part of doing business with DeCA...." He pointed out that this likely would be a "violation of the Department of Defense Joint Ethics Regulations and the Ethics Laws of the United States."

Another request was that DeCA "direct each buyer to provide a brochure with additional details to each supplier indicating an interest in the offer to participate in DeCA–Licensed Media Program(s)." Mr. Vitikacs' assessment was, "during the frequent presentations between DeCA and its vendors, the same vendor (broker) represents numerous companies and will schedule 30 minute appointment blocks for the entire day. It is far more realistic to allow PinPoint to place their brochures in the lobby area available for industry to pick-up." He noted that Pin-Point had been placing their brochures in DeCA's vendor presentation lobby since the Program began. Mr. Vitikacs added, "[h]anding out a brochure at each presentation as Pinpoint requested, would result in the same broker receiving the brochure up to 10 times a day. In addition to being redundant, this would not be well received by vendors and buyers."

Another of plaintiff's requests in February 2002 was for DeCA to encourage its Regional

---

8. Notice to the Trade 99–42 was issued on August 31, 1999. Its purpose was to "clarify the role of coupons in the Defense Commissary Agency's promotional evaluation process." The Notice discussed the importance of coupon programs to commissary customers, then added, "the coupon can be a powerful sale inducer when combined with the overall advertising campaign. Our promotional selection process has recognized this fact in a number of ways over the years. At times we have even attempted to quantify their worth by representing a portion of the coupons' face value as a price reduction. Unfortunately, the methods of coupon delivery are now so varied, and potential redemption rates so imprecise that this is no longer a practical approach. Beginning immediately, DeCA category managers will consider couponing efforts as an enhancement to the promotional offer and not attempt to directly assess their price point impact. Published DeCA sales plans will no longer announce grocery coupons directly, concentrating instead on the Voluntary Price Reduction (VPR) offer."

9. The Contracting Officer's November 15, 2001 letter concerning NTT 99–42 included the following: "Even upon full execution of your Program, the probability still exists that all customers will not receive every coupon that you might offer during the month since register tape length will depend on the amount of the shopping trip. The dollars that you indicate retail supermarkets add to the entities' bottom line are the same dollars that we now request industry subtract from the patron's bottom line price."

Directors to support PinPoint's "Shopping Spree" Program. PinPoint described the program in an attachment to the letter. Mr. Vitikacs responded, "the shopping spree program appears to have possibilities. We would need more details about the Program, including the ability of PinPoint to ensure funding to support the shopping spree program. Regional Directors can only support the Program (i.e. placing posters of winners etc.). It would be incumbent upon PinPoint to do the things necessary to ensure its success; including a proper sales force not including DeCA regional personnel."

Mr. Vitikacs concluded his Memorandum with a recommendation that the Contracting Officer not renew the Lease Agreement:

> DeCA management and its buyers have continuously put forth every effort possible within the boundaries of the Defense Joint Ethics Regulation and the Ethics Laws of the United States to promote the coupon register tape program. The [implication] from PinPoint is still the fact that they cannot sell the program without further endorsement from DeCA and its buyers and that as the situation currently exists, it is forcing PinPoint to incur costs outside of the realm of their financial capabilities. Based on these facts, it is the recommendation of this office not to renew the DeCA/PinPoint coupon register tape program license agreement.

Memorandum for CICST from Robert G. Vitikacs, February 25, 2002.

The Memorandum included several actions that Mr. Vitikacs said DeCA would be willing to undertake if the Contracting Officer decided to extend the License Agreement. These included issuing a new Notice to the Trade announcing the extension "and again reminding vendors of the benefits of this Program." *Id.* He would issue a memorandum to Regional Directors highlighting the program by having them direct cashiers to deliver register tapes with coupon-side up and mentioning the DeCA coupons. He noted that such information had been forwarded to store man-

agers nearly a year earlier, in May 2001.[10] *Id.*

The Contracting Officer informed PinPoint on March 16, 2002 that DeCA would not renew the License Agreement. He stated that the parties had not agreed on their respective roles and responsibilities:

> It is evident that at the core of most of your suggestions is the fundamental belief by your company that DeCA's buyers should "sell" your program to its vendors in the manner you outlined. Many of these selling tactics you recommend to be performed by DeCA buyers are contrary to the Department of Defense Joint Ethics Regulation and the ethic's laws of the United States by which DeCA is bound.
>
> .    .    .    .    .
>
> DeCA has always regarded this program as a viable tool that is beneficial to our patrons. However, it is apparent from the ongoing dialogue between PinPoint and DeCA that we no longer share a "meeting of the minds" in the definition, extent, and implementation of the term "promote" as applied by the License Agreement. Without this basic meeting of the minds we do not believe it would be mutually in the best interest to continue with this Agreement. Based on this, our Agency has made a decision not to renew the existing Agreement . . . .

Letter from Contracting Officer to Chief Manager of PinPoint, March 16, 2002.

The Contracting Officer repeated DeCA's decision not to renew a month later, and he requested payment of $24,883.36 in outstanding fees. PinPoint admits that these amounts were due and owed, but denies liability "as a matter of law." Plaintiff agrees that the amount of unpaid license fees currently outstanding is $39,231.60.

### B.

Plaintiff emphasized in its briefs and arguments that defendant was responsible for "promoting PinPoint's Coupon Program." Paragraph 5 of the License Agree-

---

10. PinPoint's February 14 letter asked that DeCA "[d]irect Regional Directors to instruct all cashiers to hand cash register receipts to customers

with the coupon-side up and say, 'Here are your DeCA coupons.' "

ment required DeCA to "*assist* PinPoint in the development and implementation of and effective advertising sales program...." (emphasis added). Promoting PinPoint's register tape program was one of eight duties specified in Paragraph 5, which implicates other types of assistance as well. Paragraph 5 does not limit itself to the elements listed, but they are the types of assistance that the parties contemplated.

PinPoint asked DeCA to take various actions to promote the Coupon Program while the License Agreement was in force. The Government agreed to some efforts, but others violated Department of Defense Ethics Regulations. *See, e.g.,* DOD 5500.7-R § 3-209 (prohibiting endorsement or preferential treatment of a non-federal entity or enterprise by Defense Department employees directly or by implication); *see also* 5 C.F.R. § 2635.101(b)(8) (requiring government employees to act impartially and not give preferential treatment to any private organization or individual). A November 2001 letter from the Contracting Officer to PinPoint includes the following:

> Our agreement with your company grants you a limited exclusive right to print coupons on the reverse side of our register tape; however, it does not, and cannot, designate that this is our preferred method of coupon distribution or marketing tool.... DeCA cannot endorse products or services. Requesting industry to fill out a separate advertising/marketing form, as you proposed, could give the impression that if a firm does not agree to use Pin-Point's product that they will not get the same consideration as a firm that does.

Letter from Contracting Officer to Chief Manager of PinPoint, November 15, 2001.

DeCA made vendors aware of PinPoint's Coupon Program but it could not encourage them to prefer PinPoint's Program over other in-store advertising initiatives. Plaintiff knew or should have known of these restrictions before it signed the License Agreement. For example, DeCA made it clear to PinPoint before the Agreement that it could not market the Coupon Program. It could not act as a "sales force" due to ethical and regulatory restraints applicable to most government agencies. Defendant's efforts to support PinPoint's Program included publicizing inauguration of the Coupon Program; promoting the Program to vendors attending a meeting of the American Logistics Association; providing free office space to PinPoint for nearly a year; placing advertising materials in DeCA's lobby and in the vendor/buyer presentation rooms; informing vendors of opportunities for on-site appointments with PinPoint representatives; and directing cashiers to present register tapes to commissary patrons with coupons facing up. Defendant gave plaintiff promotional schedules and lists of commissaries in the system. It provided a list of all buyers and merchandising personnel. It connected DeCA's website to PinPoint's with a hyperlink. It coordinated promotions with vendor advertising and marketing programs, and it gave PinPoint a Letter of Authorization to show Store Directors. These initiatives accord with Paragraph 5 of the License Agreement.

A November 2001 letter from the Contracting Officer to PinPoint responded to concerns about the Government's support. The letter includes the following:

> DeCA has met and exceeded all the terms and conditions of the Agreement within the constraints of Federal statutes and regulations and has worked diligently to confirm our commitment to the program. Your sales representative, Mr. Vic Erickson, noted in written communication to the [Marketing Business Unit] buyers in September 2000, that November 2000 coupon sales looked great, thanks to the help of the buyers. This confirms that our buyers have promoted the program within their regulatory limits from the inception of the program. Some additional examples of our support are listed as an attachment.

Letter from the Contracting Officer to Pin-Point's Chief Manager, November 15, 2001. The Attachment referred to in the letter shows broad support for plaintiff's Program. *See* Defendant's Appendix, p. 1159. The Contracting Officer's November 15 letter added the following comment:

> As a result of our Agency's solicitation for new advertising initiatives in 1999, your

company's program was selected based on its ability to provide patrons with an additional savings tool as well as a cost savings to DeCA for register tape. We felt strongly upon execution of our agreement that this was a viable advertising/marketing tool and continue to embrace that same opinion. DeCA will continue to support this program within the boundaries of our agreement and legal authority.

*Id.* The Record supports this statement of defendant's posture regarding the Coupon Program.[11]

PinPoint wrote the Contracting Officer a few days later to express concern that defendant had not used its best efforts to assist PinPoint's Program. Plaintiff's November 21 letter complained that DeCA was "asking [vendors] for promotional dollars ... to be applied to the price." That is, we assume, asking vendors to reduce the price as much as possible. If so, this would be consistent with the mission and policy that DeCA had expressed before and after the parties agreed on the licensing program. The law states that DeCA's mission is to "[p]rovide an efficient and effective worldwide system of commissaries for the resale of groceries and household supplies *at the lowest practical price* ...." 32 C.F.R. § 383a.3 (emphasis added). Plaintiff acknowledged in the same November 21 letter that "600 to 700 products [were] being couponed in the stores each month," apparently without directions from DeCA buyers to vendors.

The purpose of the November 21 letter that contained many of PinPoint's complaints and concerns apparently was to put defendant on notice that DeCA had failed to meet its best efforts obligation. It had another purpose—to assure DeCA that plaintiff was happy about their relationship: "We at Pin-Point think this is a great program for DeCA and want the contract extended." The letter that accused defendant of failing to use best efforts also asked the Contracting Officer for a two-year extension of the License Agreement.

## C.

Plaintiff contends that defendant's marketing strategy undermined the Coupon Program. DeCA used a "High–Low" strategy during a part of the license period then adopted an Every Day Low Price strategy. High–Low pricing is a process by which a vendor accumulates promotional trade allowances while selling at a higher price over a period, then sells its product at a very low price for a short time. Every Day Low Price or EDLP is a strategy by which the vendor spreads its promotional trade allowances over a long period and sells at a consistently lower price. If a store employs an EDLP strategy, the result can be that less money is available for promotions such as advertising. If defendant negotiated with a vendor using an EDLP strategy to obtain overall low prices, plaintiff claims that this would reduce the funds available for an advertising program like PinPoint's. The use of EDLP strategies and the use of coupons have an "inverse relationship," according to plaintiff, but it concedes that EDLP strategies and coupon programs are not mutually exclusive. Some vendors invest in both.

Plaintiff has not argued that defendant had an obligation to implement marketing strategies that would promote PinPoint's coupons. We assume therefore that the parties understood defendant's best efforts obligation to apply *within* marketing strategies that DeCA established from time to time. One of defendant's proposed findings was that PinPoint's Coupon Program "was intended to augment DeCA's pre-existing objectives, not to substitute those objectives with new ones." Plaintiff found the word "objectives" to be ambiguous and considered the point to be "irrelevant." Plaintiff did not have substantive comments in response to the finding. Defendant had no obligation to adopt mar-

---

11. These and similar comments made by or on behalf of DeCA are found throughout the Record. They show that defendant was making every effort to meet its obligations within the parameters of permissible commercial activities by government agencies. This is not a record that shows government employees being inexplicably un-cooperative or combative. They were willing to consider appropriate suggestions. Mr. Vitikacs gave thoughtful consideration to the "Shopping Spree Program" suggested by PinPoint. He recommended terminating the License Agreement, yet he outlined steps that DeCA was willing to take if the Contracting Officer decided otherwise.

keting strategies that would help promote PinPoint's Program.

The commissaries were using a High–Low pricing strategy when DeCA executed the License Agreement. Defendant moved to the EDLP strategy later. Both strategies are consistent with the DeCA's mission to sell goods to its patrons at the lowest practical price. *See* 32 C.F.R. § 383a.3 (requiring commissaries to sell "groceries and household supplies at the lowest practical price ... while maintaining high standards of quality, facilities, products and service"). PinPoint had no idea before entering the License Agreement what strategies DeCA was using or contemplating.

### D.

The Defense Commissary Agency promised PinPoint only that it would use its best efforts to assist plaintiff in presenting its Program.[12] The Agency did not guarantee that its best efforts would result in a successful coupon program. In fact, the Government disclaimed such responsibility. An April 2000 Addendum to the License Agreement contains the following disclaimer:

> PinPoint understands that entering into this License Agreement with DeCA is a business venture, and, as such, assumes any risk involved therein. DeCA cannot guarantee the success of this program and shall not be held responsible in the event PinPoint is unable to generate sufficient interest from manufacturers/vendors in the program to generate expected revenue.

License Agreement, Paragraph 5 (Addendum). The parties agreed to this Addendum seven months after having signed the original License Agreement. During that time, plaintiff had the opportunity to know exactly how legal or regulatory restrictions might affect defendant's best efforts obligations. By this Addendum, PinPoint specifically assumed the risk that its business venture would not be successful.

### E.

The best efforts standard, "whether it is expressed in terms of good faith or best efforts, cannot be defined in terms of a fixed formula; it varies with the facts and the field of law involved." *Triple–A Baseball Club Assocs. v. Northeastern Baseball, Inc.,* 832 F.2d 214, 225 (1st Cir.1987). We found it helpful in applying the best efforts standard to consider the cases in which courts found a breach of best efforts obligations. For example, a contractor breached its best efforts obligation when it ceased performance. *United Roasters, Inc. v. Colgate–Palmolive Co.,* 649 F.2d 985, 990 (4th Cir.1981) A party failed to use its best efforts when it engaged in acts of misfeasance and nonfeasance. *Bloor v. Falstaff Brewing Corp.,* 601 F.2d 609, 614 (2d Cir.1979). One court found *no breach* of a best efforts obligation where a contractor encountered difficult problems carrying out the terms of a contract. *Western Geophysical Co. v. Bolt Assocs.,* 584 F.2d 1164, 1171–72 (2d Cir.1978). Thus, "problems" meeting one's obligations under a best efforts contract may excuse performance. *Id.; see also General Dynamics Corp. v. United States,* 229 Ct.Cl. 399, 671 F.2d 474, 481 (1982) ("If, despite its best efforts, the contractor cannot meet the contractual requirements, the [other party] has obtained precisely what it bargained for, namely, the contractor's best efforts.").

None of those situations occurred here. DeCA did not refuse to perform according to the contract. It did not engage in acts of misfeasance or nonfeasance. Defendant had no problems meeting its obligations. PinPoint concedes that defendant attempted to promote the Coupon Program, but argues that such efforts were not particularly effective. Defendant made "some effort" to assist but not necessarily its best efforts, plaintiff asserts.

In fact, DeCA did meet its best efforts obligations as the License Agreement uses the term, and it made those efforts in good faith. The Second Circuit cited a definition of best efforts as "active exploitation in good faith ...." *Western Geophysical,* 584 F.2d at 1170–71. *See also Triple–A Baseball,* 832 F.2d at 225 ("We have been unable to find

---

**12.** "[DeCA] shall use its best efforts to assist PinPoint in the development and implementation of an effective advertising sales program ...." License Agreement, Paragraph 5.

any case in which a court found ... that a party acted in good faith but did not use its best efforts."). Government employees are presumed to have acted in good faith. *See, e.g., Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 795 (Fed.Cir.1993) ("[T]here is a presumption that public officers perform their duties correctly, fairly, in good faith, and in accordance with the law and governing regulations . . . .") (citations omitted).

### F.

The finding that defendant used its best efforts to assist PinPoint is fully supported by the Record. The fact that defendant accomplished efforts exemplified by the list in Paragraph 5 of the License Agreement is sufficient to resolve this case. DeCA cooperated with plaintiff to the extent permitted by law and regulation. It did nothing to hinder plaintiff's fulfillment of its duties under the Agreement. It acted in good faith throughout performance of the Agreement. This means that defendant did not breach the contract as plaintiff alleged and that plaintiff has no defense to DeCA's counterclaim for fees due and outstanding. Defendant's actions or inactions were not the cause of plaintiff's failure to make a success of the Coupon Program.

### III. PLAINTIFF'S PERFORMANCE

Plaintiff embarked upon a licensing arrangement with the Agency that manages 281 commissaries throughout the world. It had no experience with government contracting. It had no idea what marketing or pricing strategies the Agency was using or contemplating. It had no understanding of the Agency's business. It had not researched government statutes or regulations that might apply to the Agency's activities.

The Record does not show that PinPoint attempted to survey the need for a register

tape coupon program in commissaries. It did not consider the potential demand for its enterprise or the likelihood of success.[13] Contract Disputes Act cases charge bidders with information that they would have obtained from a site visit. *See, e.g., Ambrose–Augusterfer Corp. v. United States*, 184 Ct. Cl. 18, 394 F.2d 536, 546 (1968) (stating that a contractor cannot claim a loss resulting from neglecting to examine the site); and *S.S. Mullen, Inc. v. United States*, 182 Ct.Cl. 1, 389 F.2d 390, 393 (1968) (holding that a contractor is bound by what it would have discovered if it had conducted an adequate investigation). Plaintiff could have made the equivalent of a site visit by making inquiries concerning the operation of commissaries and the regulations that govern them. It could have conducted market surveys. Plaintiff had never operated a coupon program at a commissary.

PinPoint could have considered the commissaries' pricing strategies. It knew nothing of defendant's pricing strategies when it submitted the coupon proposal, but perceived only that commissaries were selling merchandise at generally lower prices. It could have researched ethical restrictions and other regulations that limited the Agency's role in promoting the Coupon Program. DeCA put PinPoint on notice that such restrictions applied. Plaintiff thought this fact "irrelevant." PinPoint did not consult outside counsel before signing the Licensing Agreement but a principal in the business who had no understanding of Government procurement law. Plaintiff considers this fact "immaterial." PinPoint did not prepare a formal written business plan. Plaintiff seems to argue that defendant had an obligation to disclose its current and future pricing strategies. It suggests that DeCA's failure to do so may be evidence of defendant's breach.[14]

13. We are aware of Mr. Thompson's comments in a letter to DeCA in October 2001. Mr. Thompson is a senior partner of PinPoint. He states that he has been in the coupon business for over twenty years and that he "did an in-depth analysis of DeCA's couponing program." It does not appear that he did the analysis before entering the Agreement, however, or that any of his experience involved government programs. Plaintiff did not raise Mr. Thompson's qualifica-

tions despite the company's experience being an issue in the case.

14. Defendant proposed the following finding: "Prior to execution of the PinPoint License Agreement, PinPoint was unaware of any EDLP pricing strategies used or contemplated by DeCA." Plaintiff agreed with this, but questioned its "materiality ... because DeCA's failure to disclose the existence of, and future plans for,

The PinPoint principal, Mr. Pettit, served as plaintiff's legal counsel for the Licensing Agreement. He was not familiar with DeCA's pricing strategy when he submitted PinPoint's coupon proposal. He did not research regulations that could affect the breadth of DeCA's best efforts to assist PinPoint's Coupon Program. Defendant asserted that Mr. Pettit "possessed no understanding as to Government procurement processes and was unaware of the existence of Government contracts as a field of law at the time PinPoint entered into the PinPoint License Agreement." Plaintiff agreed with this statement but did not believe it to be material. The statement is material because it shows PinPoint's casual and uninformed approach to this Program. Plaintiff in fact suggests that defendant had an obligation to explain to PinPoint some information that its counsel did not think was important enough to investigate.

Mr. Pettit's deposition shows that he did not know how DeCA buyers normally promoted DeCA programs. He did not know how or whether DeCA buyers could encourage manufacturers to use various licensed advertising media. He thought that buyers would encourage manufacturers "to use whatever promotional dollars they had to get into [the PinPoint] program." In fact, he did not know how DeCA did business. Plaintiff objects that defendant took these assertions out of context.

We reviewed Mr. Pettit's deposition. The comments attributed to him fairly represent the witness' testimony. They are not misleading and defendant did not take them out of context. Defendant's counsel asked Mr. Pettit if he had any understanding as to other licensed media programs that DeCA had at the time. He stated, "I didn't know what they were doing." Asked if that were a concern to him, he answered: "No. I was not—Vic Erickson was the point person that liaised with the agency. I don't know what

else was going on. He was dealing with that."

Mr. Pettit recalled that DeCA could not direct manufacturers to sign up for the Coupon Program. He made this observation, however: "[T]hey technically can't do it but they, like any other business enterprise, have to work with vendors and have certain things that they can do and would want to promote and not promote." He added, "[t]hey may not technically do it, but they can use means of moral suasion otherwise." This is wrong. *See, e.g.,* DOD 5500.7–R § 3–209 ("Endorsement of a non-federal entity, event, product, service, or enterprise, may be *neither stated nor implied* by DoD or DoD employees in their official capacities, and titles ... may not be used to suggest official endorsement or preferential treatment of any non-Federal entity ....") (emphasis added).

The Government is not "like any other business enterprise." This belief caused many of PinPoint's problems in managing the Coupon Program and understanding the License Agreement. It is a basic misunderstanding that recurs throughout the Record. Mr. Pettit's apparent attitude toward ethical restrictions that apply to government employees seems cavalier. Such an impression might be attributed to the limitations of transcribed testimony. It may reflect the fact that the witness' experience was limited to the private sector.[15]

One of plaintiff's principals wrote a letter to the General in charge of DeCA. He stated, "[i]n our contract DeCA committed to use the best efforts of DeCA buyers and merchandisers to 'promote' this Program and 'promotion' must necessarily entail endorsement. When PinPoint signed the DeCA contract, we understood 'promote' to mean 'endorsement' of the Program." PinPoint then cites Webster's Dictionary as support for its understanding of the word's meaning. If PinPoint's attorney had referred to DOD 5500.7–R § 3–209 instead, he would have found that no one at DeCA could endorse

EDLP pricing strategies, *ipso facto*, proves that DeCA failed to use its best efforts to promote the Program."

**15.** PinPoint's description to DeCA of its coupon proposal as a "turn-key merchandising system"

suggested a degree of sophistication and competence that the Program apparently did not possess when applied to a government enterprise such as this one.

plaintiff's Program in such circumstances, even by implication.

We have discussed the November 2001 letter from PinPoint that contains a request for an extension of the license. It shows that plaintiff did not understand the Agreement from the beginning. The letter states, "throughout our company's dealings with DeCA there has seemed to be considerable confusion surrounding the meaning of 'promote.'" Plaintiff signed a license agreement without understanding one of its central terms. Plaintiff also complains in the November 21 letter that,

> PinPoint brought this issue to the fore on many occasions during negotiations and in writing to DeCA over the ensuing months since the inception of the Program. "Promote" by DeCA buyers was understood [by PinPoint] as buyers mentioning, encouraging and referring vendors to PinPoint for register tape advertising during negotiations on buys. In order to show "best efforts ... to promote," DeCA vendors must recognize that DeCA buyers "promote" the Program within the context of the natural "give-and-take" that exists between buyer and seller.

Letter from PinPoint to the Contracting Officer, November 21, 2001. This statement contains implications similar to those of plaintiff's attorney, who speculated that perhaps the Government "technically can't do it but they, like any other business enterprise ... have certain things that they can do .... They may not technically do it, but they can use means of moral suasion otherwise." PinPoint assumed that its experience in marketing and couponing would transfer easily to the government sector. They did not understand that the rough-and-tumble business of merchandising in the private sector, including as the Record shows, a bit of arm-twisting at times, would not be permitted in the government arena.

## IV. DEFENDANT'S COUNTERCLAIM

The Contracting Officer informed PinPoint on March 16, 2002 that DeCA would not renew the License Agreement. He explained that the parties had not agreed on their respective roles and responsibilities. The Contracting Officer repeated DeCA's decision not to renew on April 9 and requested payment of $24,883.36 in fees owed and outstanding. PinPoint admits that these amounts were due and owed, and concedes that the amount that it has not paid DeCA is now $39,231.60. Its defenses to this debt apparently depend on a finding that the Government breached its contract.

PinPoint did not show that defendant breached the License Agreement or that it did not use best efforts to assist plaintiff as required by the Agreement. It did not show that defendant failed to cooperate or that it interfered with plaintiff's performance under the contract. The amount due defendant on its counterclaim is not disputed, so we may enter judgment on that claim.

## CONCLUSION

Defendant met its obligations under the License Agreement; it used its best efforts to assist plaintiff. Had it not been able to meet all the contractual requirements despite its best efforts, plaintiff still would have obtained what it bargained for—DeCA's best efforts. *See General Dynamics,* 671 F.2d at 481. Here, however, PinPoint bargained for defendant's best efforts to assist and defendant met its obligations of best efforts and good faith in every respect. Defendant used its best efforts "to assist PinPoint in the development and implementation of an effective advertising sales program ...."

Any limitations on defendant's performance under the License Agreement were the result of regulatory restrictions, some of which plaintiff knew before it made the Agreement. After seven months of performance under the Agreement, plaintiff acknowledged that it was assuming the risk that the venture would fail. Plaintiff could have terminated the Agreement anytime that it felt unable to attract enough vendors to make the Program profitable.

Defendant's motion for summary judgment is GRANTED. Plaintiff's motion for summary judgment is DENIED. The Clerk of Court will enter judgment for defendant on

its counterclaim in the amount of $39,231.60 plus interest at the statutory rate.   No costs.