The **MARQUARDT COMPANY**, Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 09–642 C.

United States Court of Federal Claims.

Oct. 27, 2011.

Steven J. Kmieciak, Washington, DC, for plaintiff; Joshua C. Drewitz, Washington, DC, of counsel.

Alex P. Hontos, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Donald E. Kinner, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant; Douglas Jacobson, Bloomington, MN, of counsel.

## OPINION & ORDER

HEWITT, Chief Judge.

Before the court are Defendant's Motion for Summary Judgment and Supporting Memorandum of Law (Def.'s Mot.), Docket Number (Dkt. No.) 28, filed May 16, 2011; Defendant's Proposed Findings of Uncontroverted Fact (DFUF), Dkt. No. 29, filed May 16, 2011; The Marquardt Company's Opposition to the Government's Motion for Summary Judgment (Pl.'s Resp.), Dkt. No. 30,

filed June 15, 2011; Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Fact (Pl.'s Resp. to DFUF), Dkt. No. 31, filed June 15, 2011; Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment (Def.'s Reply), Dkt. No. 32, filed July 5, 2011; and Defendant's Reply to Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Fact (Def.'s Reply to DFUF), Dkt. No. 33, filed July 5, 2011.

## I. Background

Plaintiff, The Marquardt Corporation (plaintiff or TMC), filed suit in the United States Court of Federal Claims on September 29, 2009 claiming breach by the United States (defendant or the government), acting through an Administrative Contracting Officer (ACO) in the Defense Contract Management Agency (DCMA), of its contract (the Agreement) with TMC, executed on November 22, 2006. Compl. ¶ 3. The Agreement is attached as the first exhibit to plaintiff's Complaint. *See* Compl., Ex. 1 (Agreement).

The Agreement provides that "TMC agrees to accept payment of $1,437,194.58 to settle and resolve all remaining Government obligations" under twenty-three [1] supply contracts (the underlying contracts) listed in Schedule B of the Agreement. Compl., Ex. 1 (Agreement) 3. The underlying contracts "were cost-reimbursement and fixed-price contracts awarded to TMC by various military commands" (the buying commands). DFUF ¶ 12; Pl.'s Resp. to DFUF ¶ 12.

The Agreement recites that the parties are entering into it "with the understanding that not all funding necessary to meet the Government's payment obligations hereunder [is] presently available for such purposes." Compl., Ex. 1 (Agreement) 3. Rather, "Upon execution of this Agreement the Government shall use its best efforts to obtain in an expeditious manner the funding required to meet its payment obligation of $1,437,194.58." *Id.*

Defendant contends that TMC "must be able to prove that it would have received more money but for the alleged breach of the Government's best-efforts obligation." Def.'s Mot. 1. According to defendant, "TMC cannot, and has thus failed to create a genuine issue of material fact on the issue of damages, an essential element of its breach-of-contract claim and a precondition to recovery." *Id.*

## II. Legal Standards

### A. Summary Judgment

Under Rule 56 of the Rules of the United States Court of Federal Claims (RCFC),[2] "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). The moving party has the initial burden of establishing "the absence of any genuine issue of material fact and entitlement to judgment as a matter of law." *Crater Corp. v. Lucent Techs., Inc.* (*Crater*), 255 F.3d 1361, 1366 (Fed.Cir.2001) (citing *Celotex Corp. v. Catrett (Celotex)*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).[3] The nonmoving party then

---

**1.** The exact number of contracts addressed by the Agreement is not entirely clear. The Complaint states that there were twenty-three supply contracts. Compl. ¶ 3. However, the exhibits attached to plaintiff's Complaint contradict each other. One list of contracts contains twenty-seven entries, Compl., Ex. 1 (Agreement) Schedule A, while the list on the next page contains twenty-three. Compl., Ex. 1 (Agreement) Schedule B.

**2.** Effective July 15, 2011, the Rules of the United States Court of Federal Claims (RCFC) were amended, changing the language and structure of Rule 56 to "reflect the corresponding revision of [Federal Rule of Civil Procedure 56] that became effective December 1, 2010." RCFC 56 Rules Committee Note (2011). Defendant's mo-

tion for summary judgment was filed prior to July 15, 2011 and refers to the prior version of RCFC 56. Because RCFC 56 remains the same in substance, the court applies the current version of RCFC 56. *See* RCFC 86 ("These rules and any subsequent amendments are applicable to all proceedings pending at the time of the adoption of the revision or amendment or thereafter filed, except to the extent that the court determines that their application to a pending action would not be feasible or would work injustice, in which event the former procedure applies.").

**3.** The RCFC generally mirror the Federal Rules of Civil Procedure (FRCP). *See* RCFC 56 Rules Committee Note (2002) ("The subdivision structure of RCFC 56 was reordered to more closely

bears the burden of showing that there are genuine issues of material fact for trial and must come forward with specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. A fact is material if it might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the court draws all inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp. (Matsushita)*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Mann v. United States*, 334 F.3d 1048, 1050 (Fed.Cir. 2003) (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505).

Legal issues raised by the parties' briefing, although not the focus of the motion, may be resolved on summary judgment. *See Delmarva Power & Light Co. v. United States*, 79 Fed.Cl. 205, 214 (2007) ("The legal issues before the court may be resolved on summary judgment." (citing *Long Island Sav. Bank, FSB v. United States (Long Island)*, 503 F.3d 1234, 1243–44 (Fed.Cir.2007))), *aff'd*, 542 F.3d 889 (Fed.Cir.2008); *see also City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197, 214 n. 8, 125 S.Ct. 1478, 161 L.Ed.2d 386 (2005) (resolving the "case on considerations not discretely identified in the parties' briefs," and stating that the question addressed "is inextricably linked to, and is thus 'fairly included' within, the questions presented." (citations omitted)).

### B. Contract Interpretation

"Interpretation of the clear and unambiguous language of a contract is a question of law that may be resolved by summary judgment." *CW Gov't Travel, Inc. v. United States (CW Gov't Travel)*, 63 Fed.Cl. 369, 390 (2004) (citing *Beta Sys., Inc. v. United States (Beta Sys.)*, 838 F.2d 1179, 1183 (Fed. Cir.1988)). In interpreting contractual language, the court must give reasonable

meaning to all parts of the contract and avoid rendering portions of the contract meaningless. *Fortec Constructors v. United States (Fortec)*, 760 F.2d 1288, 1292 (Fed. Cir.1985). Contract provisions "should not be interpreted as conflicting with one another unless there is no other possible reasonable construction of the language." *Int'l Transducer Corp. v. United States (Int'l Transducer)*, 30 Fed.Cl. 522, 526 (1994) (citing *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 395, 351 F.2d 972, 979 (1965)), *aff'd*, 48 F.3d 1235 (Fed.Cir.1995) (Table). Generally, the plain language of a contract controls; however, language that is reasonably susceptible to more than one interpretation, where "each [interpretation] ... is found to be consistent with the contract language," may be considered ambiguous. *Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed.Cir.1993) (citations omitted). Although the parties' differing interpretations of contract terms do not necessarily create an ambiguity, *id.*, a contract will be considered ambiguous if "it sustains the interpretations advanced by both parties to the suit." *Pacificorp Capital, Inc. v. United States*, 25 Cl.Ct. 707, 716 (1992) (citing *Avedon Corp. v. United States*, 15 Cl.Ct. 771, 776 (1988)), *aff'd*, 988 F.2d 130 (Fed.Cir.1993) (Table). "To the extent that the contract terms are ambiguous, requiring weighing of external evidence, the matter is not amenable to summary resolution." *Beta Sys.*, 838 F.2d at 1183 (citation omitted).

### C. Causation of Damages

██ A plaintiff in a breach of contract case who successfully proves liability is generally awarded expectation damages, frequently described as "damages that will place the injured party in as good a position as he or she would have been in had the breaching party fully performed." *Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012, 1021 (Fed.Cir. 1996) (internal citations omitted). "To recov-

---

conform to FRCP 56."); *see Champagne v. United States*, 35 Fed.Cl. 198, 205 n. 5 (1996) ("In general, the rules of this court are closely patterned on the [FRCP]. Therefore, precedent under the [FRCP] is relevant to interpreting the rules of this court, including Rule 56."), *aff'd*, 136 F.3d 1300 (Fed.Cir.1998); *see also C. San-*

*chez & Son, Inc. v. United States*, 6 F.3d 1539, 1541 n. 2 (Fed.Cir.1993) ("The [RCFC] generally follow the [FRCP]. [RCFC] 56(c) is, in pertinent part, identical to [FRCP] 56(c)."). Therefore, this court relies on cases interpreting FRCP 56 as well as those interpreting RCFC 56.

er for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States,* 877 F.2d 957, 959 (Fed.Cir.1989) (citing, *inter alia, Pa. Dept. of Transp. v. United States,* 226 Ct.Cl. 444, 451, 643 F.2d 758, 762 (Ct.Cl.1981)); *see Bluebonnet Sav. Bank, F.S.B. v. United States (Bluebonnet),* 266 F.3d 1348, 1355 (Fed.Cir.2001) ("Expectation damages are recoverable provided they are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty." (citation omitted)). The fourth element, causation, is necessary to ensure that "[a] defendant is not responsible at law unless accumulated experience justifies the opinion that the defendant's action materially increased the risk of the injury that occurred." 11–55 Joseph M. Perillo, *Corbin on Contracts (Corbin on Contracts)* § 55.7 n. 10 (2011).

■ In evaluating the causation element of damages in a breach of contract case, the Federal Circuit has expressed a preference for the "but for" standard, as distinguished from the substantial factor test sometimes applied by this court in *Winstar* and spent nuclear fuel cases. *See Yankee Atomic Elec. Co. v. United States,* 536 F.3d 1268, 1272 (Fed.Cir.2008) (stating that the substantial factor test is not preferred). Under the but for standard, plaintiff bears the burden to show that it would not have been injured but-for defendant's breach. *Coast Fed. Bank, FSB v. United States (Coast Fed. Bank),* 48 Fed.Cl. 402, 430 n. 25 (2000) (stating that "plaintiff bears the burden of propounding a realistic but-for scenario"); *see also S. Cal. Fed. Sav. & Loan Ass'n v. United States (S. Cal. Fed.),* 57 Fed.Cl. 598, 633 (2003) ("[E]stablish[ing] a 'but-for' world . . . is ordinarily required to state a valid claim for expectancy damages."), *aff'd,* 323 F.3d 1035 (Fed.Cir. 2003) (en banc); *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1380 (Fed.Cir. 2001) (noting that plaintiffs must demonstrate "what might have been"). However,

"[i]f a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." *Locke v. United States,* 151 Ct.Cl. 262, 267, 283 F.2d 521, 524 (1960) (citation omitted); *see also Bluebonnet,* 266 F.3d at 1355 ("[I]t is not essential that the amount [of damage] be ascertainable with absolute exactness or mathematical precision: 'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'" (quoting *Elec. & Missile Facilities, Inc. v. United States,* 189 Ct.Cl. 237, 257, 416 F.2d 1345, 1358 (1969))).

### D. Declaratory Judgment

■ "This Court may issue declaratory judgments or offer equitable relief only under an express grant of such jurisdiction in a federal statute." *Leitner v. United States,* 92 Fed.Cl. 220, 223 (2010) (citing *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)). This court lacks jurisdiction to award purely declaratory relief in breach of contract cases, but may "issue rulings of law declaring the rights of parties under a contract where such rulings are necessary to the resolution of a claim for money presently due and owing." *Hydrothermal Energy Corp. v. United States (Hydrothermal),* 26 Cl.Ct. 7, 16–17 (1992) (citing *Pauley Petroleum, Inc. v. United States,* 219 Ct.Cl. 24, 37–38, 591 F.2d 1308, 1315 (1979) (en banc)).

### III. Discussion

Defendant's chief legal argument in its motion for summary judgment focuses on causation of damages, in particular whether even a presumed breach[4] of its best efforts obligation was the but-for cause of plaintiff's damages. Defendant also contends in its motion that declaratory relief is either unavailable to plaintiff because TMC cannot be granted a money judgment or inappropriate because TMC has alternate legal remedies. In addition, the parties' briefing addresses

---

4. Defendant concedes for purposes of its motion that "TMC can create a genuine issue of material fact related to whether the Government breached

its best-efforts obligation." Def.'s Mot. for Summary Judgment and Supporting Mem. of Law, Docket Number 28, at 9.

two closely related issues: (1) what actions the government was required to take to satisfy the contract's best efforts clause; and (2) whether the government complied with the Agreement's terms when it deducted an offset of $164,232.96 owed by TMC to the government from the funds it received from buying commands rather than paying the full amount of funds recovered to TMC. Because the two related issues have been thoroughly briefed by the parties, the court may properly examine them on summary judgment in order to clarify the issues remaining for trial and expedite the litigation. *See City of Sherrill,* 544 U.S. at 214 n. 8, 125 S.Ct. 1478; *Long Island,* 503 F.3d at 1243–44. The court first addresses defendant's motion.

### A. Motion for Summary Judgment

#### 1. Damages

■ Defendant contends that TMC "must be able to prove that it would have received more money but for the alleged breach of the Government's best-efforts obligation." Def.'s Mot. 1. Specifically, defendant argues that TMC has the burden to "identify facts, properly supported by deposition testimony, written discovery responses, or documents, that show that the buying commands not only had additional funds available but would have in fact used them to fund the underlying contracts." Def.'s Mot. 7. While RCFC 56 places the burden on the moving party to show "the absence of any genuine issue of material fact," *Crater,* 255 F.3d at 1366, defendant, the moving party here, bases its motion on the contention that TMC "must be able to prove that it would have received more money but for the alleged breach of the Government's best-efforts obligation," Def.'s Mot. 1. However, it is the moving party, defendant, who bears the initial burden of proof on summary judgment. It appears that defendant misunderstands its burden of proof and it is far from clear to the court that defendant's motion is a proper use of RCFC 56.

Plaintiff responds that "there are genuine issues of material fact that mandate that the Motion be denied," Pl.'s Resp. 2, and focuses mainly on the parties' differing interpretations of the contract's "best efforts" clause

and disagreement as to the timing for application of the offsets discussed in Part III.B.

In order to establish causation, plaintiff must show what would have occurred if the government had used its best efforts in its attempt to secure funds to pay TMC the amount of $1,437,194.58. *Coast Fed. Bank,* 48 Fed.Cl. at 430 n. 25; *S. Cal. Fed.,* 57 Fed.Cl. at 633. This standard does not require, as the government suggests, Def.'s Mot. 7, that plaintiff show definitively at this point in the proceedings that potential funding sources both had funds available and would, in fact, have used them to pay plaintiff if defendant had used its best efforts to secure funding. Rather, plaintiff must show facts, by "citing to particular parts of materials in the record," RCFC 56(c)(1)(A), that tend to show that but-for the government's breach, plaintiff could have been paid additional funds.

The court understands plaintiff's contention to be that, in a but-for world where the government used best efforts, DCMA would have contacted higher-level sources in the Pentagon and at Defense Finance and Accounting Services (DFAS), and in doing so would have obtained more money to pay plaintiff the amount agreed upon in the Agreement. *See* Pl.'s Resp. 15–16 ("The Agreement does not limit the Government's obligations to ACO Hartman and her team, alone or in concert with certain disinterested buying commands, to obtain funding. It compels the Government to use its best efforts. . . . Resources were available at the Pentagon and within DFAS, but no one attempted to tap them in any effective way. DFAS had the ability to obtain the restoration of cancelled and expired funds, but DCMA failed to provide the necessary documentation so that DFAS could do that. The Pentagon has a group to address payment of aging contracts, but no one attempted to contact that group.").

In support of this contention, TMC has proffered several emails and portions of deposition testimony that raise an inference that, had the government followed up with particular buying commands or contacted higher-level officials regarding the Agree-

ment, it is plausible that more funding would have been made available. For instance, in an email that William Loesch (an ACO at DCMA during the period in question) sent to Claudia Hamler (a manager at DCMA) on July 5, 2007, Mr. Loesch stated that "[i]t continues to be my position that the Marquardt payment issues need to be handled by top management at DCMA headquarters, DFAS and Head of Agencies." *See* Pl.'s Supp.App., Dkt. No. 30–1, at A050. Mr. Loesch explained in his deposition that he meant that because the "buying activity folks just weren't, quote, coughing up the money," the heads of agency for the Air Force, Marines, etc., "that had very high level oversight that could make the decisions that needed to be made to get the dollars that were needed" should be contacted. Pl.'s Supp.App. A050. Plaintiff also relies on an email from Lisa Steg, the initial ACO assigned to obtain funding for the Agreement, to Luella Hartman, her successor ACO on TMC's case. Pl.'s Supp.App. A086–87. The email states that "[t]here are no longer buying commands for most of these contracts, so you have to use the Pentagon funding points of contact that we use on the Wynne List[.] They've promised to be helpful." Pl.'s Supp. App. A087. In her deposition, Ms. Steg explained that the Wynne list was "an initiative to close these very, very old contracts," and that "those points of contact were useful in getting funding for almost anything" and that "these contracts [the underlying contracts] are on the Wynne List." Pl.'s Supp. App. A083.

On a motion for summary judgment, the court must make all inferences in favor of the non-moving party. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. Making all reasonable inferences from the evidence proffered by TMC, the court concludes that, had the government sought funding from outside the buying commands, as was suggested by its own employees, Mr. Loesch and Ms. Steg, additional funds could have been made available to pay TMC. Plaintiff has therefore alleged sufficient specific facts to show that "defendant's action materially increased the risk of the injury that occurred," *Corbin on Contracts* § 55.7 n. 10, and that but-for the government's breach of its best efforts obli-

gation, it could have secured additional funds. There is a genuine issue for trial, *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548, and accordingly, summary judgment for defendant is not appropriate at this time. Because plaintiff has alleged sufficient facts to create a genuine issue of material fact on the issue of causation of damages, defendant's motion for summary judgment on this issue must be DENIED.

2. Declaratory Relief

Defendant also moves for summary judgment on the remaining portion of Count IV of plaintiff's complaint, which requests a declaration that "the Contract is a binding agreement against the Government." Compl. 9; Def.'s Mot. 11. Defendant contends that, because plaintiff's breach of contract claim cannot survive summary judgment due to inability to prove causation of damages, *see supra* Part III.A.1, "there is no possibility that TMC's requested declaratory relief would be 'incident of and collateral to' a money judgment [and] whatever remains of Count IV should be dismissed," Def.'s Mot. 12. Defendant further contends that, even assuming a money judgment could be awarded, it would be inappropriate to award such relief because "TMC has an adequate legal remedy" in the form of separate breach of contract actions on the underlying unpaid contracts. *Id.* Plaintiff argues that "TMC has properly alleged a monetary claim against the Government predicated on the Government's breach of the Agreement." Pl.'s Resp. 25. Plaintiff also relies on 28 U.S.C. § 1491(a)(2) (2006) and *Alliant Techsystems, Inc. v. United States (Alliant)*, 178 F.3d 1260 (Fed.Cir.1999), to support its proposition that this court "has jurisdiction 'to render judgment upon nonmonetary disputes on which a decision of the contracting officer has been issued.'" Pl.'s Resp. 25–26.

In its Opinion filed October 8, 2010, the court held that "[t]he portions of Count IV that request a declaratory judgment that plaintiff is owed interest under the [Contract Disputes Act (CDA) ] and [Prompt Payment Act (PPA) ] fail to state a claim upon which relief can be granted." *Marquardt Co. v. United States (Marquardt I)*, 95 Fed.Cl. 14,

20–21 (2010). Two of plaintiff's three requests for declaratory relief, those related to interest under the CDA and PPA, Compl. 10, were dismissed in *Marquardt I*, 95 Fed.Cl. at 20–21. Accordingly, the only additional declaration sought by plaintiff that was not disposed of by *Marquardt I* is that "the Contract is a binding agreement against the Government." Compl. 9.

■ Plaintiff's reliance on *Alliant* and other CDA cases for the proposition that the court has CDA jurisdiction over its request for declaratory relief is misplaced. The court expressly held in *Marquardt I* that the Agreement is not subject to the CDA. *Marquardt I*, 95 Fed.Cl. at 19–20 ("Because the Agreement is at most tangential to government procurement of goods or services, it is not covered by the CDA."). Jurisdiction over a request for declaratory relief in the present case depends upon whether plaintiff is eventually awarded a money judgment such that the court may "issue [a ruling] of law declaring the rights of parties under a contract where such [a ruling is] necessary to the resolution of a claim for money presently due and owing." *Hydrothermal*, 26 Cl.Ct. at 16–17 (citing *Pauley Petroleum, Inc.*, 219 Ct.Cl. at 37–38, 591 F.2d at 1315). The court has concluded that plaintiff alleged sufficient facts to show a causal effect between defendant's breach and plaintiff's damages. *Supra* Part III.A.1. Therefore it is still possible for plaintiff to prove damages at trial and be awarded a money judgment. In such a case, declaratory relief would be "incident of and collateral to an appropriate money award," *Del Rio v. United States*, 87 Fed.Cl. 536, 540 (2009) (quoting 28 U.S.C. § 1491(a)(2)), and the court would have jurisdiction also to issue appropriate declaratory relief.

Defendant also argues that, even if a money judgment were awarded, the court should still grant summary judgment in its favor because plaintiff has an adequate alternative legal remedy to recover the unpaid funds in the form of individual suits on the underlying contracts. Def.'s Mot. 12. Plaintiff fails to respond to this point. *See* Pl.'s Resp. *passim.* Because it is unclear whether or not plaintiff will prevail on its claim for money damages, and because the issue of whether

the Agreement was binding on the government has not yet been briefed by the parties, the court declines to determine at this juncture whether declaratory judgment would be appropriate if plaintiff should prevail on its breach of contract claim. *See Greenhill v. United States*, 81 Fed.Cl. 786, 791–92 (2008) (declining to grant a RCFC 12(b)(6) motion challenging a request for equitable relief until a monetary damages claim had been resolved). "A court never errs by declining to grant summary judgment when the better, or more prudent, course is to proceed to trial." *Fifth Third Bank of W. Ohio v. United States*, 55 Fed.Cl. 223, 236 (2003) (citing *Anderson*, 477 U.S. at 253–54, 106 S.Ct. 2505). Defendant's motion for summary judgment as to plaintiff's remaining claim for declaratory relief is DENIED.

### B. Disposition of Related Issues

#### 1. The Obligation Imposed on Defendant by the Best Efforts Clause

The contractual description of the government's best efforts obligation can be found in paragraph 5 of the Agreement, which states in relevant part:

> Upon execution of this Agreement the Government shall use its best efforts to obtain in an expeditious manner the funding required to meet its payment obligation of $1,437,194.58.

Compl., Ex. 1 (Agreement) 3. The parties disagree as to what defendant was required to do to meet its obligations under the best efforts clause. Because the court finds that neither party's interpretation of the clause can be sustained by looking only to the plain text of the Agreement, the court declines to decide the issue on summary judgment.

Defendant asserts that the contract between it and TMC required "[t]he Government, acting by the [DCMA], . . . to use its best efforts to *seek funds from buying commands* that had contracts with TMC that were, for various reasons, unfunded." Def.'s Mot. 1 (emphasis added). ˙ Defendant attempts with this interpretation to narrow what was required of it under the Agreement. The text does not state, as defendant contends, that the government was obligated

only to "seek funds from buying commands." Instead, the text mandates broadly that the government "use its best efforts to obtain in an expeditious manner the funding required to meet its payment obligation." Compl., Ex. 1 (Agreement) 3. The text of the Agreement contains no limitation either on how the government was required to obtain funding or on where the government was required to seek funding. Defendant's interpretation would narrow the scope of its obligations under the best efforts clause to an extent not supported by the text of the Agreement.

Plaintiff argues that, contrary to defendant's interpretation, "[s]uch an extreme limitation of the Government's obligations under the Agreement cannot be derived from the plain and unambiguous language of the Agreement." Pl.'s Resp. 12. Plaintiff also asserts that the "[b]uying commands are not the only source of funding available to the Government," Pl.'s Resp. to DFUF ¶ 24, and that "nothing in the Agreement limits the Government's obligations to the actions, or the whims, of certain unidentified 'buying commands,'" Pl.'s Resp. 6. Plaintiff asserts that "[r]esources were available at the Pentagon and within DFAS, but no one attempted to tap them in any effective way." Pl.'s Resp. 16. Plaintiff therefore asserts that, in order to meet its best efforts obligation, the government was required to seek funds from sources other than the buying commands, particularly from DFAS and the Pentagon. This interpretation also cannot be sustained given the plain language of the Agreement. The Agreement states that the government shall "use its best efforts to obtain in an expeditious manner the funding required to meet its payment obligation." Compl., Ex. 1 (Agreement) 3. Just as there is no language in the best efforts clause that limits defendant's obligation merely to obtaining funds from buying commands, there is also no requirement in the best efforts clause that the government obtain the funding from either DFAS or the Pentagon. The correctness—or not—of plaintiff's interpretation depends on its face on the existence of facts not stated in the Agreement. Both parties' interpretations rely on the assumption of facts that do not appear in the text of the best efforts clause in their Agreement.

The law interpreting the best efforts standard focuses on the factual nuances of the parties' dispute. The best efforts standard "cannot be defined in terms of a fixed formula; it varies with the facts and the field of law involved." *Pinpoint Consumer Targeting Servs., Inc. v. United States*, 59 Fed.Cl. 74, 82 (2003) (quoting *Triple–A Baseball Club Assocs. v. Ne. Baseball, Inc.*, 832 F.2d 214, 225 (1st Cir.1987)). The Federal Circuit has defined the standard as requiring "that the party put its muscles to work to perform with full energy and fairness the relevant express promises and reasonable implications therefrom." *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1375 (Fed.Cir.1999) (quoting *Macksey v. Egan*, 36 Mass.App.Ct. 463, 633 N.E.2d 408, 414 (1994)). Other courts have similarly defined best efforts to require diligence or a high level of good faith.[5] Whatever the variation in the exact terms used to express the legal standard for best efforts, courts largely agree that in many cases "disputes as to the application of 'best efforts'

**5.** See *Crum & Crum Enters., Inc. v. NDC of California*, No. 09–145, 2010 WL 4668456, at *4–5 (D.Del. Nov. 3, 2010) ("[T]he duty of 'best efforts' is more exacting than the duty of good faith, and requires the promisor to undertake its contractual obligations diligently and with reasonable effort." (citing *Nat'l Data Payment Sys., Inc. v. Meridian Bank*, 212 F.3d 849 (3d Cir.2000))); *T.S.I. Holdings, Inc. v. Jenkins*, 260 Kan. 703, 924 P.2d 1239, 1250 (1996) (defining "best efforts" as "a duty [that] requires a party to make such efforts as are reasonable in the light of that party's ability and the means at its disposal and of the other party's justifiable expectations," and noting that "the duty of best efforts is more onerous than that of good faith" (quoting E. Allan Farnsworth, *On Trying to Keep One's Prom-* ises: The Duty of Best Efforts in Contract Law, 46 U. Pitt. L.Rev. 1, 8 (1984) ("Best efforts is a standard that has diligence as its essence and is imposed only on those contracting parties that have undertaken such performance."))). Some courts also have found that best efforts can be likened to a good faith standard. See *Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 234 (3d Cir.2001) (" '[B]est efforts' [is] a form of good faith and sound business judgment." (citing *Nat'l Data Payment Sys., Inc.*, 212 F.3d at 854)); *W. Geophysical Co. of Am. v. Bolt Assocs.*, 584 F.2d 1164, 1171 (2d Cir.1978) ("The standard by which the District Court determined whether 'best efforts' had been employed, 'active exploitation in good faith,' was also proper.").

clauses present factual issues that preclude summary judgment." *Northrop Grumman Computing Sys., Inc. v. United States (Northrop Grumman)*, 93 Fed.Cl. 144, 151 n. 7 (2010).[6]

In *Northrop Grumman*, the government contracted with plaintiff to "use its best efforts to seek and utilize funding from all sources, and to request and reserve funds from the annual budget as a first priority designation, to pay the required lease payments under this lease agreement." 93 Fed. Cl. at 150. The parties disagreed both as to what the best efforts clause required of defendant and as to whether the government actually employed its best efforts in seeking funding. *Id.* The court noted that "a factual dilemma exist[ed] on a number of interlocking levels," and concluded that with so many factual uncertainties, the issue of whether defendant breached its best efforts obligation was "not amenable to summary resolution." *Id.* at 150–51.

As in *Northrop Grumman*, the parties here dispute facts which bear on whether or not defendant used its best efforts to obtain funds to pay TMC under the Agreement; in particular, the parties dispute whether the best efforts clause required the government to seek funds only from the buying commands or also to seek funds from other, higher level government sources. Each party cites disputed facts to support its position. Defendant contends that "[t]he underlying contracts are funded by the buying commands, using the appropriation the buying command receives from Congress." DFUF ¶ 14. Plaintiff argues in response that "[t]he Agreement is between TMC and the Govern-

ment not TMC and the 'buying commands'" and that "Congress does not limit the amount of money spent by an individual 'buying command' only the purpose and amount spent by the Department as a whole. As long as the Department spends money in accordance with its appropriated purpose agencies have the flexibility to spend appropriated funds as necessary." Pl.'s Resp. to DFUF ¶ 14. Defendant also argues that "[n]either DCMA nor DFAS could provide funding for the underlying contracts," DFUF ¶ 24, to which plaintiff responds that "nothing prevents DCMA or DFAS from providing funds to TMC directly to pay the obligation created by the Agreement." Pl.'s Resp. to DFUF ¶ 24. Plaintiff argues that "DFAS has resources to restore cancelled funds," and that "[b]uying commands are not the only source of funding available to the Government." *Id.* As in *Northrop Grumman*, the resolution of the parties' dispute here requires resolution of disputed factual questions and, in particular, "requires knowledge not only of what [DMCA] did, but could have done, to obtain this funding." *Northrop Grumman*, 93 Fed. Cl. at 150.

2. **Whether Defendant Was Entitled to Withhold Offset Amount From Payments Received**

The parties also disagree on the issue of when the government should have applied offsets of the amounts owed by TMC under the Agreement. Plaintiff contends that the parties took into account the amounts owed by TMC in coming to the final figure included in the Agreement, and that it was therefore improper for the government to deduct

---

**6.** Many federal courts concur with the *Northrop Grumman* court's assessment that where the parties dispute what actions were required under a best efforts clause, the issue cannot be resolved on summary judgment. *Northrop Grumman Computing Sys., Inc. v. United States (Northrop Grumman)*, 93 Fed.Cl. 144, 151 n. 7 (2010); *see, e.g., Maxim Integrated Prods., Inc. v. Analog Devices, Inc.*, No. 94–16744, 1996 WL 117425, at *3 (9th Cir. Mar. 15, 1996) (unpublished) (citing *United Telecomm. v. Am. Television & Comm. Corp.*, 536 F.2d 1310, 1319 (10th Cir.1976)); *Chen v. Cayman Arts, Inc.*, No. 10–80236-CIV, 2011 WL 3903158, at *10–11 (S.D.Fla. Sept. 6, 2011); *Whitesell Corp. v. Whirlpool Corp.*, No. 1:05–CV–679, 2009 WL 3327241, at *3

(W.D.Mich. Oct. 13, 2009); *Baron Fin. Corp. v. Natanzon*, 509 F.Supp.2d 501, 517 (D.Md.2007); *Brown v. Buschman Co.*, No. Civ. A. 99–108, 2002 WL 389139, at *5 (D.Del. Mar. 12, 2002); *Dogwood Assocs., L.P. v. Douglas Elliman–Gibbons & Ives, Inc.*, No. 91 Civ. 7895, 1993 WL 361655, at *4–5, 1993 U.S. Dist. LEXIS 12670, at *13 (S.D.N.Y. Aug. 30, 1993). Of course, in certain factual circumstances, courts have found it appropriate to rule on the issue of best efforts on summary judgment. *See, e.g., In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1374–75 (Fed.Cir. 1999); *Pinpoint Consumer Targeting Servs., Inc. v. United States*, 59 Fed.Cl. 74, 82 (2003); *Samica Enters. v. Mail Boxes Etc. USA, Inc.*, 637 F.Supp.2d 712, 717–18 (C.D.Cal.2008).

this amount before paying TMC. Pl.'s Resp. 4–5. The government contends that the amounts due by TMC were not included in the final figure in the Agreement, but rather would be offset on a contract-by-contract basis at the time that the government paid TMC the net amount due. Def.'s Reply 7–8. Each party cites portions of different contract provisions to support its interpretation. For the reasons stated below, the court concludes that the offset of $164,232.96 were already included in the net amount of $1,437,194.58 that the Agreement states is owed by the Government to TMC. Therefore, the government impermissibly applied the offset twice, withholding $164,232.96 that it should have paid to TMC.

The parties agree that this is a question of contract interpretation properly resolved on summary judgment by looking within the four corners of the document. Def.'s Reply 7 (noting that the offset issue "is a matter of contract interpretation suitable for resolution on summary judgment"); Pl.'s Resp. to DFUF ¶ 10 (noting that in resolving the offsets issue "[w]e must look to the four corners of the document and adopt its plain meaning"); *see also CW Gov't Travel*, 63 Fed.Cl. at 390.

a. Paragraph 4

■ Plaintiff asserts that paragraph 4 supports its interpretation that the offset was included in arriving at the net Agreement figure. Although defendant fails to offer an alternative interpretation of paragraph 4, plaintiff's interpretation conflicts with defendant's overall position that the offsets were to be applied on a contract-by-contract basis after the Agreement was signed. The court concludes that paragraph 4 supports plaintiff's position.

Paragraph 4 of the Agreement states:

The Government agrees that its net payment of $1,437,194.58 to TMC includes liquidation, via offset, of all amounts due from TMC under the Contracts.

Compl., Ex. 1 (Agreement) 3. Plaintiff relies on Paragraph 4 to conclude that "[t]he credits owed by TMC to the Government were accounted for in the release language of the Agreement and netted into one lump sum."

Pl.'s Resp. 4–5 (internal citation omitted). In other words, it is plaintiff's position that the $164,232.96 that the parties agreed that TMC owed the Government on the underlying contracts was offset in reaching the figure of $1,437,194.58. Therefore, plaintiff argues, the government improperly withheld $164,232.96 from the funds collected from buying commands.

Notably, defendant fails to offer an alternative interpretation of paragraph 4. Defendant instead refers to other paragraphs of the Agreement to dispute plaintiff's general argument regarding the timing of offsets. *See* Def.'s Reply 6–8.

A plain reading of paragraph 4 of the Agreement clearly expresses the parties' intent that the net payment amount of $1,437,194.58 include the offset of amounts owed by TMC to the government under the underlying contracts. Paragraph 4 therefore unquestionably supports plaintiff's view that the offsets were accounted for in arriving at the final Agreement figure.

b. Paragraphs 7 and 3

Plaintiff argues that in paragraph 7, the government released it from all further obligations on the underlying contracts, which it argues supports its view that the offsets were applied in determining the net amount due by the government. The government argues that plaintiff's interpretation of paragraph 7 conflicts with paragraph 3, which defendant interprets to mean that offsets were to be applied on a contract-by-contract basis. The court concludes that there is no conflict between paragraph 3 and paragraph 7 because a plain reading of the phrase "on a contract-by-contract basis" in paragraph 3 shows that the phrase refers not to when offsets were to be applied, but rather to the manner in which the parties listed the amounts due in Schedule B of the Agreement.

Paragraph 7 states:

The Government does remise, release and discharge TMC, its officers, agents, and employees of from all liabilities, obligations, claims, appeals and demands, which it now has or hereafter may have, whether known or unknown, administra-

tive or judicial, legal or equitable, arising under or in any way related to the Contracts.

Compl., Ex. 1 (Agreement) 3–4.

Plaintiff reads this release provision to mean that "[a]s consideration for this Agreement[,] the Government released TMC from all obligations under the Agreement, including the $164,232.96 that TMC had owed the Government under the Contracts." Pl.'s Resp. 5 (footnote omitted). In particular, plaintiff contends that the release language of paragraph 7, in conjunction with the portion of paragraph 4 that reads "[t]he Government agrees that its net payment ... to TMC includes liquidation, via offset, of all amounts due from TMC," Compl., Ex. 1 (Agreement) 3, shows: (1) that the offset of $164,232.96 was already included in the calculation of the final Agreement figure; and (2) that, because the offset was already included at the time the Agreement was signed, paragraph 7 effects a release of all further liability under the contracts, see Pl.'s Resp. 18.

Defendant contends that TMC's "interpretation of Paragraph 7 is inconsistent with Paragraph 3, whereby the parties agreed on the final amounts 'due to TMC or to the Government on a *contract-by-contract basis.'*" Def.'s Reply 7–8. Paragraph 3 states in full:

> The parties agree that the final amounts due to TMC or to the Government on a contract-by-contract basis are reflected in Schedule B of this Agreement and that the net amount due TMC, after application of all offsets and adjustments, is $1,437,194.58.

Compl., Ex. 1 (Agreement) 3. Defendant reads the initial part of paragraph 3, particularly the words "on a *contract-by-contract basis,*" as an indication that offsets were to be applied on a *contract-by-contract basis* after execution of the Agreement and were not included in the Agreement's final figure. Under defendant's reading, the offset of $164,232.96 was not already included in the net Agreement figure of $1,437,194.58, but rather was to be applied after execution of the Agreement on a contract-by-contract basis.

Based on its reading of paragraph 3, defendant concludes that plaintiff's interpretation of the release language in paragraph 7 is inconsistent with the parties' intent, expressed in paragraph 3, that offsets be applied after the Agreement was signed on a contract-by-contract basis. *See* Def.'s Reply 7–8. However, reading the words "on a contract-by-contract basis" in the context of the entire text of paragraph 3, the court concludes that defendant's interpretation cannot be sustained and that, in fact, there is no conflict between paragraph 3 and paragraph 7.

The court reads the words "the final amounts due ... on a contract-by-contract basis are reflected in Schedule B" to indicate that the list of final amounts due had been compiled by the parties and broken down by contract in Schedule B, which contains a list of each of the twenty-three contracts at issue and the respective amounts owed on each by the government or by TMC. This plain language reading does not support the government's interpretation that final amounts due would be determined and offsets applied on a contract-by-contract basis while the government sought funds to pay under the Agreement. The court's interpretation is further confirmed by the statement in paragraph 3 that "the net amount due TMC, *after application* of all offsets and adjustments, is $1,437,194.58." Compl., Ex. 1 (Agreement) 3 (emphasis added). In particular, it is not possible to conclude, as defendant urges, that the word "after" means, as defendant's interpretation requires, "before." The second clause of paragraph 3 further supports the view that the offsets were taken into account in arriving at the stated figure and would not later be deducted by the government. In the court's view, there is no conflict between paragraph 3 and paragraph 7. To the contrary, paragraph 3 strongly supports plaintiff's view that the offsets were taken into account by the parties in coming to the final Agreement figure.

c. Paragraph 5

█ Defendant argues that plaintiff's interpretation of the release language contained in paragraph 7 of the Agreement con-

flicts with paragraph 5 of the Agreement. *See* Def.'s Reply 7–8. With regard to paragraph 7, plaintiff argues that the government released plaintiff from all obligations at the time the Agreement was signed, such that the government was without authority thereafter to apply offsets. *See* Pl.'s Resp. 19. However, the parties' recitation in paragraph 5 that the government did not presently have all the necessary funds to pay TMC under the Agreement has no bearing on TMC's obligation to pay the government or when the offset of that amount was to be applied.

Paragraph 5 states in full:

The Parties enter into this Agreement with the understanding that not all funding necessary to meet the Government's payment obligations hereunder are presently available for such purposes. Upon execution of this Agreement the Government shall use its best efforts to obtain in an expeditious manner the funding required to meet its payment obligation of $1,437,194.58.

Compl., Ex. 1 (Agreement) 3. Defendant argues that TMC's "interpretation of Paragraph 7 . . . is an illogical fit with the parties' recognition, in Paragraph 5, that not all funds were presently available." Def.'s Reply 7–8. That is, defendant contends that, because the parties recognized in the Agreement that not all funds were presently available to the government to pay TMC, the release language in paragraph 7 cannot be read to excuse TMC from a continuing obligation to pay the amount of $164,232.96. Plaintiff did not have an opportunity to respond to this contention because it was raised for the first time in defendant's Reply.

Defendant's interpretation cannot be sustained. Whether the government possessed funds to pay TMC under the Agreement at the time the Agreement was signed has no bearing on whether the final Agreement amount of $1,437,194.58 incorporated offsets of amounts owed by TMC. Paragraph 5 simply is not relevant to the question of offset timing, which can adequately be answered by reference to the immediately relevant contractual provisions, including paragraphs 1, 3, 4 and 7. Moreover, the court sees no conflict between the statement in paragraph 5 that the government does not presently have funds available and the government's agreement to release TMC from liability under paragraph 7. If anything, paragraph 5 is relevant to the question of best efforts, discussed above in Part III.B.1.

d. Paragraph 1

Defendant argues that plaintiff's view of the offset timing would both render paragraph 1 of the Agreement superfluous and put paragraph 1 in conflict with paragraph 7. However, it is defendant's interpretation of paragraph 1 that puts that paragraph in conflict with at least three other provisions of the Agreement. Reading paragraph 1 in the context of the whole Agreement, the court concludes that paragraph 1 is properly interpreted to support the position that the offsets were already included in the net Agreement figure, but also to add that the parties would not view their obligations as finally settled or liquidated until the government paid TMC under the Agreement.

Paragraph 1 states in full:

All amounts due under the Contracts from TMC to the Government shall be liquidated via offset by the Defense Finance and Accounting Service (DFAS) at the time the Government pays TMC the net amount due under the Contracts.

Compl., Ex. 1 (Agreement) 2. Defendant argues that TMC's "interpretation of the release in Paragraph 7 would put that provision in direct conflict with Paragraph 1" and would render paragraph 1 superfluous. Def.'s Reply 7. Defendant also argues, based on the portion of paragraph 1 which reads, "at the time the Government pays TMC," Compl., Ex. 1 (Agreement) 2, that the parties intended that "the offsets [would] be taken *after* the execution of the Agreement." Def.'s Reply 7. Because this specific issue was raised in Defendant's Reply, plaintiff did not have an opportunity to respond to this point.

Defendant suggests that paragraph 1 be read to mean that "the offsets [would] be taken *after* the execution of the Agreement." Def.'s Reply 7. However, this interpretation is not only not mandated by the wording of the provision, it would also put paragraph 1

unnecessarily in conflict with at least three other provisions of the Agreement.[7]

Paragraph 3 states that "the net amount due TMC, *after application of all offsets* and adjustments, is $1,437,194.58." Compl., Ex. 1 (Agreement) 3 (emphasis added). A plain reading of this provision supports plaintiff's view that the offsets were taken into account in reaching the net Agreement figure of $1,437,194.58. This plain reading conflicts with defendant's interpretation of paragraph 1 that the offsets would instead be taken after the Agreement was signed rather than included in the net payment amount.

Defendant's interpretation would also conflict with paragraph 4, which states that "[t]he Government agrees that its net payment of $1,437,194.58 to TMC *includes liquidation, via offset,* of all amounts due from TMC under the Contracts." Compl., Ex. 1 (Agreement) 3 (emphasis added). As noted above in Part III.B.2.a (discussing paragraph 4), it is the court's view that paragraph 4 also supports plaintiff's interpretation. Paragraph 4 can only be read to state that the offsets of amounts owed by TMC to the government were already included in the figure of $1,437,194.58. Defendant's interpretation of paragraph 1 conflicts with the court's conclusion that paragraph 4 is best read to indicate that the offsets were included in the final Agreement figure because defendant reads paragraph 1 to mean exactly the opposite—that the offsets would be applied after the Agreement was executed and were not already included in the Agreement figure.

Finally, defendant's interpretation of paragraph 1 conflicts with Schedule B to the Agreement, which shows that the amount of $164,232.96 (the total amount that TMC owed the government on all of the twenty-three underlying contracts, reached by totaling the amounts in parentheses) was already subtracted in coming to the final number of $1,437,194.58. Compl., Ex. 1 (Agreement) Sched. B. If defendant's interpretation of paragraph 1 were correct, then the amounts

of TMC's offsets would not already have been subtracted in arriving at the total Agreement figure. Instead, the total Agreement figure or, as Schedule B terms it, "[n]et payment amount," Compl., Ex. 1 (Agreement) Sched. B, would have been the total of amounts owed by the government to TMC, without including offsets. Schedule B does not support this interpretation because the amounts on Schedule B show that the $164,232.96 was already subtracted in arriving at the Agreement figure or net payment amount of $1,437,194.58.

Defendant is correct that an " 'interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless.' " Def.'s Reply 7 (quoting *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir.1983)); *see also Fortec,* 760 F.2d at 1292. However, contract provisions also "should not be interpreted as conflicting with one another unless there is no other possible reasonable construction of the language." *Int'l Transducer,* 30 Fed.Cl. at 526 (citing *Hol–Gar Mfg. Corp.,* 169 Ct.Cl. at 395, 351 F.2d at 979). The government's argument that plaintiff's interpretation puts paragraph 1 in conflict with paragraph 7 and renders paragraph 1 superfluous is unavailing. Instead, it is the government's interpretation of paragraph 1 that cannot be sustained because it conflicts with three other provisions of the Agreement which are themselves internally consistent.

The court therefore declines to read paragraph 1 in the manner suggested by defendant and instead interprets paragraph 1 in the context of the entire Agreement. Paragraph 1 provides that "[a]ll amounts due under the Contracts from TMC to the Government shall be liquidated via offset ... at the time the Government pays TMC." Compl., Ex. 1 (Agreement) 2. The word 'liquidate' has been defined as "[t]o settle (an obligation) by payment or other adjustment; to extinguish (a debt)." *Black's Law Dictionary* 949 (8th ed. 2004). It is the court's

---

7. Paragraph 1 is so inconsistent with the remainder of the Agreement that it is quite possibly left over from an earlier draft of the Agreement that the parties failed to harmonize with the final version of other agreed terms. The court none-theless attempts a reading that "gives a reasonable meaning to all parts of the contract." *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir.1983).

view, reading paragraph 1 in a manner consistent with the remainder of the Agreement, that paragraph 1 indicates that the parties agreed to view the amounts due by TMC on the underlying contracts as finally "settled" or "extinguished" once payment had been made by the government. In other words, the parties agreed in paragraph 1 that TMC's debt would be viewed as finally extinguished (by operation of the offset previously applied) at the time that the contract is fully performed, that is, when the government pays the amounts owed to TMC under the underlying contracts. This interpretation does not conflict with an interpretation of Schedule B and paragraphs 3 and 4 of the Agreement that the offset of amounts owed by TMC was taken into account in determining the final payment amount of $1,437,194.58.

In addition, the foregoing interpretation does not put paragraph 1 at odds with the release language of paragraph 7, which provides, "The Government does remise, release and discharge TMC ... from all liabilities." Compl., Ex. 1 (Agreement) 3–4. Plaintiff contends that paragraph 7 means that "[a]s consideration for this Agreement, the Government released TMC from all obligations under the Agreement, including the $164,232.96 that TMC had owed the Government under the Contracts." Pl.'s Resp. 5 (footnote omitted). Defendant contends that plaintiff's reading of paragraph 7 conflicts with its interpretation of paragraph 1, which would require that TMC's liability for the amounts it owed the government extend past execution of the Agreement and until such time as the offsets could be applied on a contract-by-contract basis. Def.'s Reply 7. Both interpretations conflict with the court's reading of paragraph 1, which is that—although the offsets were applied in coming to the figure of $1,437,194.58—the parties agreed in paragraph 1 to extinguish all debts at the time the government performed its payment obligation under the Agreement.

Paragraph 7 states that the government "does remise, release, and discharge TMC ... from all liabilities;" however, paragraph 7 does not indicate when the government will do so. Plaintiff's interpretation that TMC

was released from all further obligations upon execution of the Agreement is not the only possible interpretation of the text. Reading paragraph 7 together with paragraph 1, the court finds that the parties agreed that the offset would be included in the $1.4 million figure, but that the final extinguishing of all debts would occur "at the time the government pays TMC," or when the contract was fully performed, as stated in paragraph 1. This interpretation avoids the major defect of defendant's interpretation, which is the creation of a conflict between paragraph 1 and three other contractual provisions that are in agreement, and avoids as well the conflict that plaintiff's interpretation of paragraph 7 creates with paragraph 1. The court therefore reads paragraphs 1, 3, 4 and 7 together to provide that the offsets were already applied in arriving at the net payment amount, but that both parties would view their debts as finally extinguished at the time that the Government pays TMC under the Agreement.

e. Schedule B

Neither of the parties explicitly relies on Schedule B to support its interpretation, but the court finds Schedule B instructive in determining the proper resolution of the offset issue. Schedule B to the Agreement lists final payment amounts owed either by the government or by TMC on each of the underlying twenty-three contracts. Compl., Ex. 1 (Agreement) Sched. B. The amounts owed by TMC are enclosed in parentheses and the amounts owed by the government are not enclosed in parentheses. *See id.* Schedule B shows that the amount of $164,232.96 (the total amount that TMC owed the government on all of the twenty-three underlying contracts, reached by totaling the amounts in parentheses) was already subtracted in coming to the final number of $1,437,194.58 owed to TMC by the government under the Agreement. *See id.* The underlying numbers detailed in Schedule B support the conclusion that the offset was already subtracted by the parties in determining the final Agreement figure of $1,437,194.58.

#### f. Defendant Improperly Withheld $164,232.96 From TMC

The plain language of the contract supports plaintiff's position that the offsets of amounts owed by TMC to the government had already been subtracted from the amounts owed by the government to TMC to arrive at the Agreement figure of $1,437,194.58. In paragraph 4, "[t]he Government agree[d] that its net payment of $1,437,194.58 to TMC includes liquidation, via offset, of all amounts due from TMC under the Contracts." Compl., Ex. 1 (Agreement) 3. In paragraph 3, "[t]he parties agree[d] that ... the net amount due TMC, after application of all offsets and adjustments, is $1,437,194.58." *Id.* In paragraph 7, the government agreed to "discharge TMC, its officers, agents, and employees of from all liabilities, obligations, claims, appeals and demands" under the underlying contracts. *Id.* And in Schedule B, the parties clearly laid out the amounts owed by the government and by TMC and could only have subtracted the offsets of amounts owed by TMC in arriving at the net payment amount of $1,437,194.58. *See* Compl., Ex. 1 (Agreement) Sched. B. Paragraph 1 should not be read to conflict with the balance of the relevant Agreement provisions. The court concludes, therefore, that the final dollar figure in the Agreement ($1,437,194.58) already included the offset of funds owed by TMC to the government.

Plaintiff alleges, and defendant does not dispute, that the government received a total of $1,197,515.09 from the buying commands, Pl.'s Resp. 19, but withheld $164,232.96 of those funds to "offset" (effectively, for a second time) the amounts initially owed by TMC to the government, Def.'s Reply 4 ("[I]t is undisputed that the Government has already paid Marquardt approximately $1 million under several contracts and withheld $164,232.96 in obtained funds to offset debts on several others."). Because $164,232.96 had already been accounted for in arriving at the $1,437,194.58 figure owed by the government to TMC, the government wrongfully withheld $164,232.96 from TMC.

### IV. Conclusion

The court finds that, as to the contract interpretation issues: (1) the standard required under the best efforts clause cannot be resolved on summary judgment in this case; and (2) under the Agreement, the amount of $1,437,194.58 already included the offset of amounts owed by TMC to the government, and therefore the government improperly withheld from TMC $164,232.96 of the funds received from the buying commands. Regarding defendant's summary judgment motion, there is sufficient evidence to raise a genuine issue of material fact as to whether, had the government used best efforts, it could have obtained additional funds to pay TMC under the Agreement and whether plaintiff is entitled to declaratory relief. Accordingly, defendant's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.